It please the Court, Paul Achtoff, appearing on behalf of the County of Hawaii. Whereas in the previous case the ordinance addressed disclosure of genetically engineered crops, Hawaii County passed Ordinance 13-121 to protect local residents, the rights of Hawaii's unique natural environment from transgenic contamination by freezing production of genetically engineered crops to the existing footprint while accepting papaya, which at that time was already well established and relatively widespread, that's what papaya was grandfathered in. Now Hawaii has no statutory scheme within the meaning of Richardson as required by Hawaii Law of Implied Preemption that exclusively governs either genetically engineered crops or whether or where any crops can be grown. In fact, when the county considered enacting the ordinance, it asked the Attorney General whether it was constitutional, and the Attorney General's response, which is in our excerpts of Record 36, said, the State of Hawaii currently has no statute regulating the propagation, cultivation, raising, growing, sale, or distribution of transgenic organisms. So, in fact, eight years ago, the County of Hawaii passed an ordinance prohibiting growing genetically engineered coffee to protect the Big Island's world famous Kona coffee industry as well as prohibiting growing genetically engineered taro. That has been on the books now for at least eight years. The State never objected, the Department of Agriculture never objected, nobody objected and said, oh well this is preempted by the State, you can't do this. Yet that ordinance, in effect, is virtually indistinguishable from Ordinance 13-121, and yet it's been on the books for eight years without objection. In fact, the State has never objected, the State has never made the arguments that the appellees in this case are making and that support Judge Kern's decision. In fact, after Hurricane Isel a few years ago went through the Big Island and blew over people in their homes without power or water, the County of Hawaii passed an ordinance allowing the County to enter private property when necessary to remove these potentially harmful plants. Did the State object? No. Did anybody object? Not that I'm aware of. And yet, under the theory, under Judge Kern's ruling in this case, and under the theory that's been argued by the appellees, the County can't do that. Yet that's exactly what the police power is for. The police power exists to allow the County to do exactly what it did with that harmful plant for each one of these statutes, these ordinances. And are you taking questions on federal preemption in this case? You're just talking about State preemption. My colleague will be handling those questions. So there's no question that if the State wants to regulate genetically engineered crops or albizia trees or whatever, it can do so. Nobody's denying that. That's not the question in this case, whether the State could regulate those things if the legislature decides that it's appropriate. Of course the legislature can do that. Could the Department of Agriculture regulate them if it chooses to? Possibly. That's also not the question in this case, because mere authority to do something under Richardson Court's test for implied preemption, there's absolutely nothing in Richardson that says that merely because we have a Department of Agriculture with broad authority, that the County's police power has been stripped away with respect to anything that has to do with plants. But here, doesn't the law, it seems to clearly authorize the Department of Agriculture to identify and restrict harmful plants. No question. Agreed. Okay. Okay. Okay. And it seems like the State Board of Agriculture is to set statewide agricultural policy. Do you agree with that? To some degree, they have the power to set state policy, but I would add that statewide policy and statewide, even a law of statewide application, is not the same as exclusive authority that precludes exercise of the police power. So I guess that's where I'm headed and where you're at, I guess, because I'm just trying to figure out why would that power not be exclusive? Well, I think the burden on a party alleging preemption is to prove the exclusivity. The question is, where is that exclusivity? Is it in the legislative history? Is it in the language of the statute? All we have is a statute that says the Department of Agriculture, if it wants to, pardon me, may designate a plant as restricted. Well, fine. Let it do that. And if it does that, that will, if it wants to designate a genetically engineered plant as restricted, I don't see anybody complaining. If it wants to designate an albizia tree as restricted, great, then the counties won't have to do it. And you agree that there's no part of Hawaiian law that specifically gives the counties authority to identify and restrict harmful plants? I believe that it's clear under Hawaii Supreme Court precedent that the police power is all the power that the county needs. But my question was specifically, so just... Well, a specific law that specifically delegates... Or just gives the county authority to identify and restrict harmful plants. I'm not aware of any such law. As I was saying, it's established that the Hurop court specifically said, well, you have the police power. That's all you need in the absence of preemption. So you do not need a specific delegation on everything that is covered by the police power. The police power is broad, and that's the language of the Hawaii courts. Okay, so how do you, with respect to implied state preemption, how do you distinguish in re-application of Anamazoo, which concluded that a city ordinance regulating contractors was preempted by a state statutory scheme that vested a board with broad powers relative to the licensing and regulating of contractors? So I mean, is it your position that a broad delegation of rulemaking authority to a state agency can never preempt local laws concerning subjects that fall within the scope of the delegation, unless the agency has issued a rule regulating that specific subject? I think my position would be close to that, but let me deal with your question about distinguishing Anamazoo. In Anamazoo, the state created a specific licensing scheme requiring all contractors to get licensed by the Hawaii Contractors Licensing Board. And this license affirmatively granted contractors the right to practice their trade throughout the state. And then the county ordinance specifically prohibited duly licensed contractors from practicing in that county without an additional credential, and in the words of the Anamazoo court, quote, severely diluting the value of a uniform state licensing system. And the conflict was clear, and the court emphasized it. The court said, a person satisfying the state standards acquires permission to pursue his occupation throughout the state, and this permission may not be circumscribed by local authorities. And that was key. There is no state law addressing the state's, the ordinance's subject matter. No state law grants anyone the right to grow these crops, and there is no interference with any state law. So the Anamazoo is distinguishable in all of those ways, which are some of the ways in which Richardson distinguished Anamazoo. Here, if the state department of agriculture is authorized to regulate harmful plants and has chosen not to ban the GMOs. We don't know that. Well, let me just, I'm just proposing this. Let's say they're authorized to regulate harmful plants and then has chosen not to do that or chooses not to do that. Just on that premise, isn't the county ordinance prohibiting the state, what the state law permits? State law does not, if the state had a law that said you may do this, then I would agree that the county cannot pass an ordinance that says, no, you may not. That's Anamazoo. The county has no law saying you may grow whatever you want, wherever you want. All we have is a department of agriculture, which like every department of agriculture in the country has broad authority to deal with harmful plants. That does not cut off the county's police power. Wouldn't that be a conflict? I see no conflict. There is no right that anybody is treading on. There is no state action that is being conflicted with. All we have is a state, is a department with broad authority, which it can exercise in various ways and has not exercised in this area. And if it wants to exercise it, then we would look at how it exercised it in relation to the ordinance. Thank you, counsel. Thank you. Gabby, why don't you put on 730 for ... We'll give you your 730 at your request. Thank you, Your Honor. Good morning. I'm Andrew Kimbrell. I'm here on behalf of Hawaii County. I'm here to discuss the federal preemption issue. The sole issue before the court in this appeal is whether the preemption clause under the Hawaii County Ordinance ... In the court below, the industry did say that there was perhaps an implied preemption claim that was rejected by the court below, and subsequently the industry dropped its appeal. So here we are with the clause itself. And I want to just discuss briefly the very unusual legal setting in which we examine this particular question. In 2013, this court in Center for Safety v. Vilsack held that the very harms that the county is trying to avoid, which is transgenic contamination and pesticides use accompanying that transgenic, those transgenic crops, were not plant pest harms under the Plant Protection Act. The court specifically held, yes, there are real harms, yes, there's economic harms, yes, there's transgenic harms, but they're outside the scope of the Plant Protection Act. The agency's hands are tied. They can't do anything. At the same time, in the USDA's briefing, APHIS came before this court and said, we agree. Our hands are tied. We cannot do anything about transgenic contamination. We can't do anything about the pesticides that go along with these transgenic crops. But, and they specifically said, this should be handled in their briefs, and it's in our briefs. It should be handled through state and local planting restrictions. This is in 2013. So here we have this court saying, hey, the matter of this ordinance is not something that's under the scope of the Plant Protection Act. Sorry. And then we actually have the relevant agency that you'd think that they would know whether it's preempted or not. It's their agency. It's their preemption clause that they regulate. And they said, no, no, no. Actually, this should be solved. The answer here is no fears. These real harms of transgenic harm, these real harms of pesticides, they are going to be solved at the local and state level through planting restrictions. So it would seem to me fairly implausible at this point that the court would say, listen, this statute doesn't have the power to regulate the harms that are in this ordinance. Ah, but it does have the power to restrict the states and localities for doing that, even though the very agency involved says, yeah, that's exactly the way to handle it, state and county planting. And it reminds me a little of the Lohr case, where if that were to be true, then these real harms, and not only this court, but even the Supreme Court in Monsanto v. Gertz and Seed said, these are real harms, harms so significant that the farmers there had standing in that case, there would be no redress. As that court said, it is hard to believe that Congress intended to give no redress to a group of people who are suffering harms. Can we drill down on the federal preemption since we have limited time here? Sure. Now with respect to the express federal preemption issue, do you agree that the county ordinance seeks to control plants that are regulated by APHIS as plant pests under the PPA? No, we do not agree. There are several categories of plants that are covered, and the definitions are different. The articles we're talking about here that are pursuant to the ordinance, that the ordinance is regulating, are regulated articles. They are not plant pests. They are not noxious weeds. No genetically engineered plant has ever been determined by the Secretary to be a plant pest or to be a noxious weed. It's never happened. Not one. 117 regulated articles have gone through this process, which this court has described quite accurately as a presumptive plant pest goes through the process to see if it is, and I'm quoting this court exactly, an actual plant pest. What about presumptive plant pests are regulated by APHIS like other plant pests, aren't they? Presumptive plant pests are regulated by APHIS, yes. So why shouldn't they be considered plant pests for the purposes of the express preemption analysis? Well, we have right now two presumptive candidates from each party for presidency. They're not actual candidates. They are presumptive candidates. We have reason to believe they may be candidates, but they haven't gone through the process yet. A regulated article is not a per se plant pest. Are they on APHIS? No, not yet. Not yet. They may not be regulated sufficiently either, Your Honor. Let's move past that. The regulated article is not a per se plant pest, and that's why I said it's very important the language in Sydney vs. Vilsack, because there Judge Schroeder says, listen, the whole point of the examination is does this presumptive plant pest then become an actual plant pest through this long review process in Part 340? That's the whole process. If it were an actual plant pest to begin with, which is what the entity is saying, then that would be a different process. They would say, here, we have a GMO. It is a plant pest, and now we're looking to see if it stays a plant pest. That's not what the Supreme Court says, and that's not what the regulations say. They say- I'm just trying to- Sure. So if a presumptive plant pest were not a plant pest within the meaning of the Plant Protection Act, wouldn't it follow that APHIS lacks authority to regulate presumptive plant pests? No, it wouldn't, because under the preemption clause, the reason this is important, the reason we're talking about it in terms of preemption is that the preemption clause says this only applies if the county state ordinance is done in order to control a plant pest or in order to control, right? So if it's not, as in the case of Wyatt, it's not there, this ordinance does not control a plant pest or an oxidous weed, but rather a regulated article, it does not follow the preemption clause. Well, let me give you a hypothetical, then. If the panel were to hold that this is a hypothetical, that only express federal preemption applies, would the ordinance be facially invalid or only invalid as applied to plants that are regulated under the PPA and have not been deregulated? We agree with Judge Curran's lower court ruling that to the extent that a regulated article has been determined to be a plant pest or has been determined to be an oxidous weed, it would be preempted if it also fulfilled the other prongs, and there's other prongs, of this preemption clause. Because it says you have to be, in order to be, you know, for this to apply to you, county ordinance, state ordinance, you have to be regulating a plant pest or an oxidous weed. If that were to be determined, it hasn't been determined yet, no GE crop, no regulated article ever has been, but should they do that, we agree with Judge Curran's decision. We hope you'll affirm that decision saying yes. To the extent that a regulated article is then determined to be a plant pest or determined to be an oxidous weed, through a separate administrative determination, yes, then it would fall afoul of the preemption clause and it would be preempted. So just to be clear, you're saying that the ordinance does not restrict GMOs that are also plant pests? I see my time is up, Ellen. Go ahead and answer. I'm sorry, can you say the question again? Go ahead and answer. So you're saying that the ordinance does not restrict GMOs that are also plant pests? That's correct. It does not, at this point, do that, no. And it could not do so. Should the agency at some point make a separate determination that one of these regulated items, one of these presumptive plant pests is an actual plant pest, yes, then it would fall afoul, as Judge Curran said in his decision. We agree with that. We have no disagreement with that. Thank you, counsel. Andy, equalize the time, why don't you put 20 minutes on? Thank you, Your Honor. May it please the Court. I'm Chris Landau, and once again, I'm here to address the state preemption issues in this case. With me today at counsel table is Rick Bress, who will address the federal preemption issues in this case. I'd like to start, if I might, just with the legal framework that we have here, which is the Richardson test, because I think it has been, even though the test is very clear, I think opposing counsel has really muddied the waters there. That test said that a state law, whether a state law preempts a county ordinance depends on whether it covers the same subject matter embraced within a comprehensive state statutory scheme disclosing an express or implied intent to be exclusive and uniform throughout the state. I think a lot of the discussion that we've heard this morning is along the lines of saying, well, nothing in the state laws regulating potentially harmful plants prohibits the counties from doing anything in this area. But we know from Richardson on its face that this intent can be implied, as it was in the Anamizu and Citizens Utilities case. And those were very much cases where the Hawaii Supreme Court looked to comprehensive state authority that was given over a particular area and said, when we're dealing with counties, which, after all, are creatures of the state and are authorized to exercise only those powers given by the state, we have to figure out what was the state really intending. If the state created a comprehensive scheme, was it really leaving room for the counties to supplement, or was it meant to be exclusive and uniform at the state level? With respect to GMOs, the county now wants to pass a complete ban. In this case, we're talking about a complete ban on GMOs on the theory that they are allegedly harmful plants to other plants and to the environment because of these cross-pollination concerns. Those are the very kinds of concerns that the state can regulate through its comprehensive mechanism under the quarantine law, Section 150A, which is an entire subsection of the law, which I'm sure we all had to fill out those forms on the plane, which go to that very issue. They're very concerned about bringing potentially harmful plants into the state. But let me ask you this. How can we hold that a state law impliedly preempts counties from banning GE crops when state law, including HRS Sections 141 to 143 and 194-2A, clearly recognize that counties may control plant pests? And then you've got the state attorney general's letter explaining that the state does not have any laws regulating GE crops. Isn't that persuasive evidence that the legislature did not intend exclusive state regulations of GE crops? Absolutely not, Your Honor. And let me start with that letter because I think the opposing counsel made a reference to that. And that is incredibly misleading. That letter was a response. Kind of. Yeah. So un-mislead me then. Please, please. That letter was a response. It was an email response to a letter sent one day earlier by the county of Hawaii saying, we've seen that we're considering a bill. It was a different bill at that time. It was more about labeling. And it says, we've seen that you recently, attorney general's office at the state level, had expressed some constitutional concerns about that. Those were all about labeling. They were First Amendment concerns. It's attached. We attach this to our brief. And the letter that the county was referring to, the state letter, is also attached there. It is clear that the county was not asking about is the state scheme exclusive. And in the state letter responding to that, it says, Hawaii has no statute regulating GMOs or GEs as such. So we don't dispute that there's no regulation of, there's no statute specifically regulating GEs. It falls within the ambit of the harm, all the various plants that regulate a broader field, potentially harmful plants. We don't agree, by the way, that these would fit within the regime of potentially harmful plants because we don't think they're harmful. The point is, they believe that the county's concerns, the very concerns that underlie the ordinance at issue here are concerns, as we heard today, about cross-pollination. Those kind of concerns are precisely the kind of concerns that the state has complete and a very comprehensive regulatory system over. The 150A system, the 152 noxious weed statute. There's an advisory board on potentially harmful plants. There is an incredibly reticulated scheme. And they say, oh, well, you can't have a comprehensive state statutory scheme when you're talking about multiple statutes. That gets things backwards. The fact that it's being addressed in multiple interlocking statutes only underscores how deeply the state is involved in covering this. The idea that the state is leaving the county's room to completely ban a category of plants that the state has said it's fine to bring them in is preposterous. This is not an area that the state doesn't care about or doesn't have a mechanism. There is this reticulated board that covers when it comes in. Those are the quarantine laws, which even allow the state to go beyond the quarantine, go into the fields and after the point of entry to make sure those are enforced and allows restricted plants. Then there's the noxious weed statute. They say, oh, this can't be a noxious weed. They cite an Oxford English Dictionary for the proposition that a weed is something that's unintended. But the Hawaii definition of noxious weed in the state statute is much broader. It says, any plant species which is or may be likely to become injurious, harmful, or deleterious to the agricultural industry of the state as determined and designated by the Department from time to time. Again, we believe that it's not deleterious and shouldn't be classified as that. But they believe that it is. This is the debate that we should be having at the statewide level. There's no room here to have this debate at the county level and have the county be banning things that the state has allowed in and the state has determined do not meet these responsibilities, these requirements. Is there anything in Judge Curran's opinion that you disagree with? On state preemption, Your Honor, I would say no. I think he very clearly explained that there are these comprehensive regimes. I can't speak to the federal preemption issues. Because he finds federal express and not federal. And Mr. Bress will speak to that. I'm the state guy here this morning for this case. But I wanted to go back to the point. We've heard a lot from the other side about, well, there's this police power statute in Hawaii. That is a very general police power statute, but it actually is very carefully limited. It's general, not specific, doesn't say anything about plants. And then it says, you may have this police power on any subject matter not inconsistent with or tending to defeat the intent of any state statute where the statute does not disclose an expressed or implied intent that the statute shall be exclusive and uniform throughout the state. So the state very carefully, in the very provision where it was giving this police power, said, but wait a second, we don't want anybody to construe this as a blank check we're giving the counties. We're only giving it, you know, but pursuant to you can't have authority that goes beyond or that would trench on an area that is expressly or impliedly occupied by the state. And I think it's interesting the Hawaii Supreme Court in Richardson took as its preemption test basically this language. So the preemption is kind of the flip side of the authority issue here. The police power is circumscribed to prevent it from encompassing things that would otherwise be preempted, that are being dealt with at the state level. So I think that's really the... I know you're arguing that the state, the Department of Agriculture has comprehensive authority over this or that as a result of the broad authority the Department of Agriculture has, the state has a sort of comprehensive regulations in place. But I guess I'm just trying to figure out how do we know, and I'd like to see what you say to this, how do we know that the Hawaii legislature didn't intend for the state Department of Agriculture's plant regulations to set like the minimum or the floor for, you know, their policy such that the county could supplement with their own regulations because probably a state, you know, can't anticipate everything. And so what's your response to that? My response to that is the Hurip case, which has been cited by the other side, which is a case where the state statute made it clear, and it was a statute in the legislative history, that it was intended to be a minimum floor. And that's a case where a comprehensive statute, it was about insurance, car insurance, and the state statutory scheme, the same argument was made, hey, there's a whole comprehensive state scheme for insurance that preempts the county ordinance. The court looked at that scheme and said, well, we're looking at the legislative history, and there are references here to this is a uniform minimum basic standard of insurance. And the fact that it was minimum suggested that it did not occupy the field for that reason. There is absolutely nothing in the legislative history or the statute here that suggests that the state regulatory authority for harmful plants is just setting minimum standards. And I can't overstate the importance of this. In all of the cases in which the Hawaii Supreme Court has- There's nothing saying that it's not. Well, Your Honor, but that's why you have to go back, and then you're kind of in the land of looking for indicia that makes it comprehensive. And I think here we have, we're not just relying on the comprehensive scheme. We're also relying on the fact that state officials are brought into the scheme, there are representatives of each of the county officials are brought into the state scheme to make sure that they participate and have a voice there. Again, that is inconsistent with the idea that the counties had independent regulatory authority. We're relying on the fact that in both pesticides and harmful plants, I guess this is the harmful plant case, 150A-10 creates an advisory committee on plants and animals, again, that doesn't talk about the counties being involved. To the contrary, it talks about expertise. Certain experts in the area have to be there. The state regime is a uniform regime based on scientific expertise. There's no contemplation that counties based on political concerns or whatever, voter initiatives, can come in and say, well, we think this is what we want to do. I mean, the state regime, to the extent it's based on expertise, is inconsistent with that. And what case do you point to that you think serves the best example for us to follow that's most similar to your situation? I think the Anamisu case, for the very reasons that Judge Callahan described earlier, the court said that there's a very comprehensive state regime. It allows the contractors to practice their trade and doesn't, by implication, it doesn't allow the counties to supplement that. The exact thing could be said here. There's a comprehensive regime that allows these GE plants to be brought in and used in Hawaii without being restricted or regulated, and therefore the counties impliedly can't go and do what the state didn't do. That would be inconsistent with that reticulated statutory scheme. So I think those provisions, when you look at them, there's a fundamental legal issue here that I think is important for the court to understand. The other side makes the argument that unless, and to the extent that the state doesn't actually exercise a particular regulatory authority, the extent of the regulatory authority per se is irrelevant. We're only looking at things the state has done. They base that on the Ewing case from the Intermediate Court of Appeals. The Ewing case is very different because in the Ewing case, there was a state law that said, it was a noise ordinance, and this is about a boom box, and somebody was prosecuted under the local ordinance about noise. And one of the defenses was, noise is exclusively a statewide issue. And the court said, no, it isn't. We're looking at the state statute, and the state statute says, the counties may regulate noise except as inconsistent with a state rule. So they said, well, there's no field preemption here because we see on the face of it that it is allowing the counties to have a role except as inconsistent. So it's obvious that in Heurop, excuse me, in Ewing, they were looking to see whether there was an inconsistent state rule. And they decided that the state rule there was not inconsistent because it governed vehicular noise, and they decided that means noise emitted by the vehicles, not by a boom box inside the vehicle. But that case certainly does not stand for the proposition, as they are suggesting, that to have a comprehensive statutory or comprehensive state scheme preemption, you have to actually identify affirmative regulatory authority. And I think the key point here is that the Hawaii framework of statutes contemplate no role for the counties in banning or otherwise regulating GE crops. And to allow county bans would turn that absolutely on its head. Again, understanding and keeping in mind that the counties have no authority except insofar as it comes from the state. Your time is winding down. We'd better get to federal preemption. Thank you, sir. Thank you, Your Honor. Chief Justice, Judge Thomas, and may it please the Court, I'd like to first correct some of the framing of the express preemption provision and then address its specifics. In terms of the framing, APHIS didn't say in Vilsack and has never said that it lacks the ability, for example, to protect against cross-pollination for crops that it is still regulating under permits or under notification. To the extent that it was discussing its lack of authority in that respect, it was talking about crops that have been deregulated. Crops that are under regulation are actually regulated quite stringently to protect against cross-pollination and the like. I guess they have talked about that, but the record in previous court decisions show that genetic drift from GE crops have caused significant economic damage to non-GE farmers. Isn't managing this type of land-use compatibility issue with the traditional core power of local governments? Your Honor, it may be within their power, but for the fact that the federal regime is regulating it and the state's interference with that, or the county's, in this case, interference with that, would actually disrupt and frustrate the regime. I'll get to this a bit more in implied preemption when I discuss this in the next case or the case after that. But the rationale essentially is that these field trials are going on for two purposes. Number one, because the agency has the authority from Congress under 7701 to facilitate commerce in plants while at the same time protecting against plant pest harms. So they're allowing the field trials both to accomplish that goal of facilitating commerce in these plants, which were found again under that same section, to be critical to the U.S. economy, but also because the agency has to determine whether these plants rightly are within its jurisdiction. In other words, whether these really are plant pests. And an inability to have these kinds of field tests would deprive the agency of its ability to actually determine its own jurisdiction because without the field tests, the agency doesn't have the data to determine whether these should be deregulated or should continue to be regulated as plant pests. Well, I know you're going to argue both of them, but there's a couple things I want to ask you. Do you agree that express preemption clause does not apply to state and local regulations of federally deregulated GE plants? Absolutely, Your Honor. Okay, so that's not really at issue here. That's not at issue. Okay. But then I'm assuming that I don't know if you're probably going to cover it. You're going to cross-pollinate here between this and the next case, I think. As long as this Court doesn't regulate against that. Judge Curran found express preemption correct and not implied. That's correct. And Judge Mulway in the other one found both, right? That's also correct, Your Honor. All right. So when I was asking Mr. Landau about was there anything he disagreed about Judge Curran, I'm assuming you're going to say that you think he got the implied preemption wrong? That's exactly right, Your Honor. I think he got things half right. Okay. I prefer to think positively. But you're not raising that as a cross-pollination? We have not, Your Honor. Okay, so we'll talk about that over on the other one? We'll talk about it. Okay. In terms of the express preemption, then, the agency has for prior to the enactment even of this statute, the agency had long taken the position, and we've cited in our briefs, and, for example, you can find it at 58 Federal Register 17053. It's always taken the position that to the extent that it is regulating a crop, to the extent that it has regulatory authority of the crop, the states can't add additional requirements during that time period. The express preemption provision at issue in this case is an outgrowth of that historic position that APHIS had always taken. And the ordinance here flunks all three requirements, or one could put it differently, meets all three requirements of the express preemption statute. To begin with, these are crops, as Your Honor mentioned, that are regulated by APHIS as plant pests. APHIS told the court this in Vilsack on page 5 of its brief. This court recognized that. To the argument that these are merely presumptive plant pests, actually, there's a definitive answer to that as well, which is when this regulatory scheme under Part 340 was first enacted, APHIS explained in the preamble to its notice of proposed rulemaking exactly what it was doing and why. And what it said, and this is at 51 Federal Register 23355, it said USDA is proposing to regulate only genetically engineered organisms or products which are plant pests or for which there is reason to believe are plant pests. It then went on, USDA believes that an organism or product is a plant pest, is one, if the donor recipient vector or vector agent of the genetically engineered organism or product comes from a member of one of the groups listed in Section 340.2. That's all of the plants that are at issue in this case. They all have plant pest constituents. It then went on and said, USDA further believes that a genetically engineered organism or product should be designated as a regulated article when, based on experience, the deputy administrator determines the organism or product is a plant pest or has reason to believe is a plant pest. So the first category, which the agency believes is a plant pest, are the ones that are at issue here. There is another category of regulated articles where, for other reasons, APHIS might determine they are plant pests or have reason to believe. But the category here is being regulated as a plant pest based on APHIS' determination that that's how it should be regulated until or unless it is proved to the agency that it is not a plant pest, at which point it's deregulated. But until and unless that happens, it's regulated as a plant pest. So that's one of the three requirements. A second requirement is that the ordinance that's at issue here, the Big Island Ordinance, is regulating in order to prevent the dissemination or introduction of the plant pest. That's undoubtedly true here. The entire ordinance's point is to prevent the dissemination and introduction of these plant pests. Now they say otherwise because they say, well, the reason we're doing that is different. We're doing that in order to protect against pesticide harms, or we're doing that in order to protect against cross-pollination. This preemption provision isn't interested in that second level reason. So long as it's in order to prevent the dissemination or introduction of these plants, and it undoubtedly is, it doesn't matter what reason they've got for it. So let me ask you in a different way. So what's your position on whether the ordinance bans GMOs that are not plant pests? Does it? Your Honor, okay, I think I understand your question. It may on its face, and let me address this if I may just for a second, and if I'm not answering you, I'm happy to pause. But it does on its face appear to regulate plant pests that are not made with a plant pest constituent as well. Right. And those are not regulated as plant pests. And we're not arguing that it is preempted to the extent it touches those. But as we note in our brief, to our knowledge, there aren't any in Hawaii anyways. So in terms of the relevant plant pests that we're talking about here, they're all made with the, I mean, sorry, in terms of the relevant GE crops that are at issue here, they are all made with a plant pest constituent and therefore are regulated by the agency as plant pests, and the ordinance does cover those. Does that answer your question? I'm sorry. I think it does because I'm just trying to figure out if the ordinance could expressly preempt GMOs that are plant pests but yet not expressly preempt those GMOs that are not plant pests. Does that make sense? I think that it's in fact what it does do. I don't think it's speaking to non-plant pests. And you would agree then it doesn't expressly preempt non-plant pests. That's right. To the extent that you've got a non-plant pest, this provision isn't speaking to it. That's correct. And I gather your position is if the state of Hawaii adopted the language that was identical to this ordinance,  Same result, Your Honor. the federal scheme doesn't distinguish between the states and the counties in that regard. The third requirement So how does federal preemption work in your view given the state scheme? Does the federal express preemption affect the current state scheme in your view? No, Your Honor, because the state to this point at least has not chosen to try to regulate GE plants. It hasn't singled them out for any kind of regulation. It hasn't singled them out for reporting, for bans, for anything of that sort. So there's nothing to preempt right now in the state scheme. I agree that the state has authority qua state within its state scheme to attempt to do that kind of a regulation. If it did so, we would think it would be preempted just the same. The third requirement of the conflict preemption statute, of course, is that the ordinance is regulating the movement in interstate commerce of the planted issue. And on that, again, we think that Judge Kern got it right. The reason is two. First of all, you've got plain language here, which is the word movement is defined under the Plant Protection Act to include release into the environment. And while it's a bit of an odd phrase, release into the environment in interstate commerce certainly takes in the kinds of things that this ordinance is trying to regulate. Because they're trying to regulate, for example, if through pollen or through seeds being stuck in tractors or what have you, these crops are being grown in a field that is a conventional or organic field and therefore entering commerce in that way. And they're trying to protect against what they view as those harms. Of course, it makes sense if you're in California and you're talking about Nevada. But in Hawaii, it's a little bit different. It's a little bit different. But again, Your Honor, when you're talking about a plant that can grow in a neighboring field, absent, again, strong regulation by APHIS. And by the way, the regulation really is quite strong and quite rigorous. If it enters that next door neighbor's farm and it grows, the plants that are being sold from Hawaii by no means are being limited to sale within Hawaii. They are sold interstate. There's no question about that entering interstate commerce. But there's another reason as well, and this has to do with history. Because understanding this term is made a whole lot easier by understanding where it comes from. And that's that when 340 was first promulgated, in the preamble, APHIS addressed some comments that had come in that said, well, we don't understand how you can regulate mere releases into the environment. Because it seems from the statute you're only allowed to regulate imports, exports, and the like. And APHIS took the position that the statute was broad enough to allow it to regulate releases into the environment, even though that wasn't expressly defined within the term movement. When Congress amended and consolidated the statutes into the Plant Protection Act, Congress added release into the environment into the definition of movement. There's no way to read that other than to shore up APHIS's ability to regulate under the regulation of movement in interstate commerce prong, regulation of intrastate planting that causes these sorts of releases or could cause these releases into the environment. The argument otherwise actually would strip APHIS of its entire authority to regulate intrastate planting. Because under 7.7.1.2, the same phrase is used. And under 7.7.1.1, the same phrase is used, movement in interstate commerce, to define what the agency's permitting authority is. And so if you took my opponent's argument to heart, APHIS would like the authority to regulate intrastate planting of GE crops. Now, that's not a tenable interpretation because when Congress enacted the Plant Protection Act, it expressly incorporated the regulatory scheme that had preexisted and said that that would continue to be effective until changed or until or unless changed by Congress. The idea that Congress implicitly, well, the idea that Congress in a statute like the Plant Protection Act, which was explicitly meant to enhance the authority of APHIS, took away all of APHIS's authority to conduct these field tests and have intrastate planting restrictions is really kind of beyond belief. I don't even think my opponents are really arguing that, but that is the consequence of adopting their interpretation of movement in interstate commerce. Thank you, Counsel. Thank you. Thank you. Three minutes. The issue here with respect to the state-implied preemption is that as Judge Curran said in one of his orders, and perhaps in both, but they're equally applicable, he said these plant-related laws that the state has, quote, set out the state's role in identifying potentially harmful plants, and that they do. But Judge Curran wrongly concluded that because the state has a role, the counties do not. And that's the crux of this. Mr. Loundow said that these are the kinds of concerns the state can regulate. Fine. We agree. But because the state can regulate does not mean that the county cannot. There are mention of various statutes that are sort of kind of pointed to as potentially regulating, but if the quarantine statute, for example, is the law that Richardson requires that the court find exclusively governs genetically engineered crops, why didn't Judge Curran just say so? He didn't. And if it's the exclusive law governing genetically engineered crops, where does that leave the noxious weed law? Clearly neither of them is exclusive, which is what Richardson requires. Does the noxious weed law even cover genetically engineered crops? We've explained in detail in our brief why the existing regulation of the Department of Agriculture would preclude designating a genetically engineered crop as a noxious weed. It must be, for example, it must be capable of competing with cultivated crops for nutrients, water, or sunlight. Well, these are cultivated crops. They don't compete with cultivated crops. They are the crops that the noxious weed law was designed to protect. They're simply not noxious weeds within the meaning of the noxious weed law. Could the Department of Agriculture enact a regulation that makes them noxious weeds? Perhaps it could. It hasn't. And with respect to the quarantine statute, this ordinance does not regulate the import or export of genetically engineered plants. They're free to pass in and out of the state and in and out of the county. They do it every day. All this regulates is growing them within the county. And the quarantine law, there's plenty of legislative history, which we've cited in our brief, which makes it clear that it's about importation. It is not designed to regulate what you can grow. So where is the Hawaii case from the Hawaii Supreme Court that in any way supports the analysis that Judge Curran did? There simply isn't one. It doesn't comply with Richardson. HURUP doesn't support it. I've already distinguished Anamizu. There's the only other case out there that anybody cites is the Citizens Utilities case, but that is a case in which the state granted the Public Utilities Commission exclusive authority over a very specific, well-defined field, all public utilities. There is no analog here with the Department of Agriculture having exclusive, well-defined authority over genetically engineered crops or any relevant subject matter. And in Citizen Utilities, the county enacted an ordinance, which clearly and directly conflicted with what the PUC had done, making it impossible to comply with both, which is something that the court pointed out as significant. So there is no case in Hawaii that supports Judge Curran's implied preemption analysis. And the only other thing I want to say before I sit down is I just heard counsel. Did you mean to say his implied or his expressed preemption? Implied. I'm sorry if I said otherwise, but I meant implied. Okay. I'm talking only here about the state preemption of the ordinance. Oh, okay, the state. Yes. Okay. The last thing I want to point out is that I want to agree with something that I heard Mr. Brice just say, which is that the state has no scheme regulating genetically engineered plants. We agree with that, and we believe that because it does not, there is no scheme to be preempting this ordinance. Thank you, counsel. Just a few things. First of all, the assertion that APHIS-USDA actually has the power to regulate cross-pollination, which the opposing counsel said is simply false. I point you to page 28 of our reply brief, and APHIS, as I'm quoting APHIS, APHIS reasonably determined that cross-pollination is not a plant pest risk. Gene transfer does not itself injure, cause damage, or cause disease in any plant, and that way is not part of the plant pest. This is for, they have no regulation over deregulated crops. So this is about these field trial crops. So, and this was affirmed, of course, in the Senate Procedure v. Vilsack. So that is not correct that the USDA has any regulatory power over cross-pollination. It doesn't, and this court affirmed that. The second thing I'd like to deal with is it is true that the first trigger in the preemption clause is that the ordinance in question has to involve a regulation of an article in movement in interstate commerce. Now we can't separate movement, which the opposing counsel tried to do. We agree that releasing environment is kind of a movement. It releases something into the environment. But you cannot release that from the prepositional phrase in interstate commerce. Commerce is defined in the regulations as trade, traffic, or other commerce. The very definition of a regulated crop, which is what it issues here, these field trial crops, is that they cannot be in commerce until they've been deregulated. This is confirmed by the Supreme Court in Monsanto v. Gertz and Siege. So they are not, by definition, they're not in commerce. And since it's intra-county, they're not interstate anything. They're not interstate activity. The first state is 3,000 miles away, and this is not even interstate. This is intra-county. So the idea that somehow this ordinance involves, which it has to, this is the original trigger of the preemption clause, somehow has to involve an article that is in interstate commerce when these items are lawfully not in commerce. When they're not interstate, they're intra-county, right? So I think that you cannot, I mean, friends have neighbors, words have neighbors, and you cannot somehow separate movement from the prepositional clause in interstate commerce, and there's no doubt that these articles under the ordinance are not in interstate commerce. And the final thing I'd like to talk about, and it's really important, is the definition of regulated article, which is in the definitions, 340.1. Opposing counsel said somehow the definition of regulated article means that every regulated article is per se a plant pest, and therefore in the second prong of the preemption clause which says you're only preempted if you're dealing with a plant pest or noxious weed, and they say, well, it's dealing with plant pests because every regulated article is a plant pest, or at least these ones that we're talking about. But that's not true. If you look at the definition, it is very clear that there are two categories. At the end, it's very clear. And these are the two categories. The only two categories of a regulated article are those which the administrator has determined is a plant pest or has reason to believe is a plant pest or has reason to believe. Two categories. So that's your choice, regulated article. In every case, because the bacterium involved in these plants has been disarmed and put into these genetically engineered corn plants and other plants, the agency says, does the mere presence of that now genetically engineered disarmed bacteria that used to be a plant pest, is it going to exhibit any of those harms in the genome that is in this plant? And they take a look at that. And out of 117 times they said no, because they had reason to believe it might. So, so far, if you look at those two categories of regulated articles, on one side that have been determined by the administrator to be a plant pest, zero. On the other hand, that might be, presumptively, may believe, is the second category here, to be a plant pest, 117. So the fact that somehow this definition automatically makes a regulated article, at least field trial crops that we're talking about here, a plant pest, is simply false. And it seems to me that there's a lot about plain language being the intent of Congress here. And it seems to me what the other side would actually like to do here is they would like to add to the series of things that are covered, not just plant pests or noxious weeds, but also say, you know what, this has got to include regulated articles. They could have done it, right? The statute actually was done after the regulations, right? Subsequent to the regulations. They saw the regulations. They chose not to put regulated articles in there, but only plant pests and noxious weeds. And they would also like to amputate the term in interstate commerce from that and just say, hey, this applies to any plant that's in movement. That kind of linguistic surgery is not something that this court can do. That's something they should go to Congress to see. Thank you very much. Thank you, counsel. Thank you all for your arguments this morning. And we will take a ten-minute recess. Thank you. All rise.
judges: Thomas, Callahan, Murguia